1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CARLSON LYNCH LLP**
Todd D. Carpenter (CA 234464)
tcarpenter@carlsonlynch.com
Scott G. Braden (CA 305051)
sbraden@carlsonlynch.com
1350 Columbia Street, Ste. 603
San Diego, California 92101
Telephone:  619.762.1910
Facsimile:   619.756.6991

*Attorneys for Plaintiff and
Proposed Class Counsel*

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHRISTOPHER BROWN, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>ADIDAS AMERICA, INC., an Oregon corporation, and DOES 1- 50, inclusive,<br><br>Defendants. | Case No.   **'21 CV 1686 L     LL**<br><br>**CLASS ACTION COMPLAINT**<br><br>**1. Violation of California's Unfair Competition Laws ("UCL");** CAL. BUS. & PROF. CODE §§ 17200, *et seq.*<br><br>**2. Violation of California's False Advertising Laws ("FAL");** CAL. BUS. & PROF. CODE §§ 17500, *et seq.*<br><br>3. **Violations of California Consumer Legal Remedies Act ("CLRA");** CAL. CIV. CODE §§ 1750, *et seq.*<br><br>**[DEMAND FOR JURY TRIAL]** |

Plaintiff Christopher Brown ("Plaintiff") brings this action, on behalf of himself and all others similarly situated, against Defendant Adidas America, Inc. ("Adidas" or "Defendant"), and states:

## I.      NATURE OF THE ACTION

1.      American consumers thrive on finding the best deal. Retailers, including Defendant, are keen to this fact and try to lure consumers to purchase their goods with advertised sales that promise huge savings off the regular price. But the promised savings are false if a retailer simply recasts its regular price as a discount from some higher, fictitious "original" price that no one ever pays. This class action seeks monetary damages, restitution, declaratory and injunctive relief from Defendant arising from its deceptive business practice of advertising fictitious reference prices and corresponding phantom discounts on Adidas branded outlet merchandise sold in Defendant's outlet stores in California.

2.      The practice of false reference pricing occurs when a retailer fabricates a false "original" price, and then offers an item for sale at a deeply "discounted" price.  The result is a sham price disparity that misleads consumers into believing they are receiving a good deal and induces them into making a purchase. In reality, the practice artificially inflates the true market price for these items by raising consumers' internal reference price, and therefore the value, ascribed to these products by consumers.  The practice enables retailers, like Defendant, to sell their goods above their true market price. Consumers are damaged by the inflated market price that is established by the false-discounting scheme.

3.      An overview of the illegal scheme and attendant harm are best demonstrated by the following example: Take a retailer who is in the business of selling suits. That retailer knows it can sell a particular suit at $250.00. That $250.00 price represents the "market" price for the suit and the price at which the retailer regularly offers the suit for sale and makes a profit.  The retailer then offers the suit on sale.  However, instead of discounting the suit from its true original price of $250.00, the retailer utilizes an inflated, "original" price for the suit and lists it at $1,000.00, and then holds it out for sale at ***70% off***—rendering

the "*sale*" price of the suit $300.00. Consumers who happen upon that purported fake "sale" are influenced by the amount of the perceived, substantial discount. By presenting the consumer with a false "original" price of $1,000.00, the retailer has increased demand for the suit through the ***perceived value*** of both the suit itself and the substantial discount of $700.00. This effect, in turn, impacts the market price of the suit because more consumers are willing to pay $300.00 for a suit they believed was once sold for $1,000.00, when, in fact, the true market price of the suit, without the false discount, was $250.00. If the retailer tried to sell that same suit, for $300.00, ***without*** offering the false original price of $1,000.00 and the attendant 70% off discount, that retailer would not be able to sell any suits at $300.00 because the true market price of the suit is $250.00. Thus, through the use of a false original price and the corresponding phantom discount of 70% off, the retailer was able create a false "market" price for the suit—at $300.00. Plaintiff's case seeks that disparity—the impact on the increase in market price from $250.00 to $300.00 through Defendant's application of an illegal discounting scheme.

4. Retailers, including Defendant, substantially benefit from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions. The information available to consumers varies for different types of products, but consumers frequently lack full information about a product and, as a result, can incorporate information from sellers to make purchase decisions.

5. Through its false and misleading marketing, advertising, and pricing scheme alleged herein, Adidas violated, and continues to violate, California and federal law which prohibit the advertisement of goods for sale discounted from former prices that are false. California and federal law also prohibit the dissemination of misleading statements about the existence and amount of price reductions. Specifically, Defendant violated, and continues to violate: California's Unfair Competition Law, CAL. BUS. & PROF. CODE §§ 17200, *et seq.* (the "UCL"); California's False Advertising Law, CAL. BUS. & PROF. CODE §§ 17500, *et seq.* (the "FAL"); the California Consumer Legal Remedies Act, CAL.

Civ. Code §§ 1750, *et seq.* (the "CLRA"); and the Federal Trade Commission Act ("FTCA"), which prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and false advertisements (15 U.S.C. § 52(a)).

6.    Plaintiff brings this action on behalf of himself and other similarly situated consumers who have purchased one or more Adidas branded outlet products from an Adidas outlet store in California that was deceptively represented as discounted from a false reference price. Plaintiff seeks to halt the dissemination of this false, misleading, and deceptive pricing scheme, to correct the false and misleading perception it has created in the minds of consumers, and to obtain redress for those who have purchased merchandise tainted by this deceptive pricing scheme.  Plaintiff also seeks to enjoin Defendant from using false and misleading misrepresentations regarding former price comparisons in its labeling and advertising permanently. Further, Plaintiff seeks to obtain damages, restitution, and other appropriate relief in the amount by which Defendant was unjustly enriched as a result of its sales of merchandise offered a false discount.

7.    Finally, Plaintiff seeks reasonable attorneys' fees pursuant to Cal. Civ. Proc. Code § 1021.5, as this lawsuit seeks the enforcement of an important right affecting the public interest and satisfies the statutory requirements for an award of attorneys' fees.

## II.    JURISDICTION AND VENUE

8.    This Court has original jurisdiction of this action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2). The matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5,000,000 and at least some members of the proposed Class (defined below) have a different citizenship from Defendant.

9.    The Southern District of California has personal jurisdiction over Defendant because Defendant is a corporation or other business entity which does conduct business in the State of California. Defendant conducts sufficient business with sufficient minimum contacts in California, and/or otherwise intentionally avails itself to the California market through the operation of the Adidas outlet stores within the State of California.

10.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Defendant transacts substantial business in this District, and a substantial part of the events giving rise to Plaintiff's claims arose here.

### III.     GENERAL ALLEGATIONS

#### A.     Retailers Benefit from False Reference Pricing Schemes.

11.     Defendant engages in a false and misleading reference price scheme in the marketing and selling its products in its Adidas outlet stores.

12.     Retailers substantially benefit from employing false reference pricing schemes and experience increased sales because consumers use advertised reference prices to make purchase decisions.  The information available to consumers varies for different types of products,[1] but consumers frequently lack full information about a product and, as a result, can incorporate information from sellers to make purchase decisions.[2]

13.     Defendant's deceptive advertised reference prices are thus incorporated into the consumer's decision process. First, a product's "price is also used as an indicator of product quality."[3]   In other words, consumers view Defendant's deceptive advertised reference prices as a proxy for product quality. Second, reference prices "appeal[] to

---

[1] Even within a product, consumers may have imperfect information on the individual attributes. Economists describe "search goods" as those whose attributes "can be ascertained in the search process prior to purchase" (*e.g.*, style of a shirt), "experience goods" as those whose attributes "can be discovered only after purchase as the product is used" (*e.g.*, longevity of a shirt), and "credence goods" as those whose attributes "cannot be evaluated in normal use" (*e.g.*, whether the shirt's cotton was produced using organic farming methods). Darby, Michael R., and Edi Karni. "Free Competition and the Optimal Amount of Fraud." *The Journal of Law and Economics* 16 no. 1 (1973): 67-88, pp. 68-69.

[2] "Not only do consumers lack full information about the prices of goods, but their information is probably even poorer about the quality variation of products simply because the latter information is more difficult to obtain". Nelson, Phillip. "Information and Consumer Behavior." *Journal of Political Economy* 78, no. 2 (1970): 311-329, pp. 311-312.

[3] Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 54. Also see Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

consumers' desire for bargains or deals."[4] Academic researchers note how consumers "sometimes expend more time and energy to get a discount than seems reasonable given the financial gain involved," and "often derive more satisfaction from finding a sale price than might be expected on the basis of the amount of money they actually save."[5] Under this concept, coined as "transaction utility" by Noble Prize-winning economist Richard Thaler, consumers place some value on the psychological experience of obtaining a product at a perceived bargain.[6]

14.   Research in marketing and economics has long recognized that consumer demand can be influenced by "internal" and "external" reference prices.[7] Internal reference prices are "prices stored in memory" (*e.g.*, a consumer's price expectations adapted from past experience) while external reference prices are "provided by observed stimuli in the purchase environment" (*e.g.*, a "suggested retail price," or other comparative sale price).[8] Researchers report that consumer's internal reference prices adjust toward external reference prices when valuing a product.[9] For infrequently purchased products, external reference prices can be particularly influential because these consumers have little or no

---

[4] Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 52.

[5] Darke, Peter and Darren Dahl. "Fairness and Discounts: The Subjective Value of a Bargain." *Journal of Consumer Psychology* 13, no 3 (2003): 328-338, p. 328.

[6] "To incorporate … the psychology of buying into the model, two kinds of utility are postulated: *acquisition utility* and *transaction utility*. The former depends on the value of the good received compared to the outlay, the latter depends solely on the perceived merits of the 'deal'". Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 205.

[7] Empirical results "suggest that internal reference prices are a significant factor in purchase decisions. The results also add empirical evidence that external reference prices significantly enter the brand-choice decision." Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 68.

[8] Mayhew, Glenn E. and Russell S. Winer. "An Empirical Analysis of Internal and External Reference Prices using Scanner Data." *Journal of Consumer Research* 19, no. 1 (1992): 62-70, p. 62.

[9] "Buyers' internal reference prices adapt to the stimuli prices presented in the advertisement. That is, buyers either adjust their internal reference price or accept the advertised reference price to make judgments about the product's value and the value of the deal." Grewal, Dhruv, Kent B. Monroe, and Ramayya Krishnan. "The Effects of Price-Comparison Advertising on Buyers' Perceptions of Acquisition Value, Transaction Value, and Behavioral Intentions." *The Journal of Marketing* 62 (1998): 46-59, p. 48.

prior internal reference.[10]  In other words, "[t]he deceptive potential of such advertised reference prices are likely to be considerably higher for buyers with less experience or knowledge of the product and product category."[11]  Academic literature further reports that "there is ample evidence that consumers use reference prices in making brand choices"[12] and publications have summarized the empirical data as follows:

> Inflated reference prices can have multiple effects on consumers. They can increase consumers' value perceptions (transaction value and acquisition value), reduce their search intentions for lower prices, increase their purchase intentions, and reduce their purchase intentions for competing products … Inflated and/or false advertised reference prices enhance consumers' internal reference price estimates and, ultimately, increase their perceptions of value and likelihood to purchase[.][13]

15.     Retailers, including Defendant, understand that consumers are susceptible to a good bargain, and therefore, Defendant has a substantial financial interest in making the consumer believe they are receiving a good bargain, even if they are not. A product's reference price matters to consumers because it serves as a baseline upon which consumers perceive a product's value.

**B.      California State and Federal Pricing Regulations Prohibit False "Original price" references and Out-Dated "Original price" references.**

16.     Under California law, a retailer may only discount an item from its own ***original price*** for up to 90 days; or in the alternative, it may offer a discount from the original price of an item being offered by a competitor, within the relevant market, for up to 90 days.  In either scenario, a retailer can only offer a "sale" from an original price for 90 days.  At that point, on day 91, the retailer has two options: the product must either return to its full original price,

---

[10] As Thalen notes, "the [suggested retail price] will be more successful as a reference price the less often the good is purchased." Thaler, Richard. "Mental Accounting and Consumer Choice." Marketing Science 4, no. 3 (1985): 199-214, p. 212.

[11] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

[12] Kalyanaram, Gurumurthy, and Russell S. Winer. "Empirical Generalizations from Reference Price Research." *Marketing Science* 14, no. 3 (1995): G161-G169, p. G161.

[13] Grewal, Dhruv, and Larry D. Compeau. "Pricing and public policy: A research agenda and an overview of the special issue." *Journal of Public Policy & Marketing* 18, no. 1 (1999): 3-10, p. 7.

or the retailer may continue to sell the product at the discounted price, *__as long as it discloses__* *__to the consumer the date on which the product was last offered for sale at its full retail__* *__price__*. *See* BUS. & PROF. CODE § 17501.  Under California law, a retailer cannot use an old, outdated, "original price" as the basis for a sale or discount unless it discloses to the consumer the date on which the prior original price was offered in the market.

17.    Additionally, under the FTCA, when a retailer offers a discount from *__its own__*, former *__original price__*, the original price is required to have been a price at which *__the retailer__* held that item out for sale *__on a regular basis__*, for a *__commercially reasonable period of__* *__time__*.  *See* 16 C.F.R. § 233.1(a) and (b) (emphasis added).

### C.    Defendant's Fraudulent Price Discounting Scheme Violates California State and Federal Regulations.

18.    Defendant advertises merchandise for sale by listing on the merchandise's price tag *two* fictitious and misleading reference prices: 1) a "*__regular price__*" and 2) a reduced "*__our__* *__price__*" from which an additional "discount" is taken. Defendant's outlet merchandise is uniformly accompanied by signage stating "take an additional _% off" (the already reduced "*__our price__*") to arrive at the final "sale price." Thus, Defendant has marked the merchandise with two false reference prices—a "*__regular price__*" and a further discounted "*__our price__*," which appears alongside a "_% off" sign that takes an additional "discount" from the already "reduced" "*__our price__*." These seeming discounts from higher reference prices convey to consumers, including to Plaintiff, "the product's worth and the prestige that ownership of the product conveys." *Hinojos v. Kohl's Corp*., 718 F.3d 1098 (9th Cir. 2013) (*citing* Dhruv Grewal & Larry D. Compeau, Comparative Price Advertising: Informative or Deceptive?, 11 J. Pub. Pol'y & Mktg. 52, 55 (Spring 1992) ("By creating an impression of savings, the presence of a higher reference price enhances subjects' perceived value and willingness to buy the product."). "Misinformation about a product's 'normal' price is…significant to many consumers in the same way as a false product label would be." *Hinojos*, 718 F.3d at 1106.

19.    The reason why the *__regular price__* and the *__our price__* reference prices are either false or misleading is because Adidas either: 1) has never offered the outlet goods for sale

at the ***regular price*** or the ***our price*** (in the case of its "made-for-outlet" merchandise), or 2) has offered the goods for sale at their ***regular price*** or the ***our price*** at some time period in the distant past—in violation of the 90-day time period afforded it to discount merchandise under California law[14] and the federal regulation requiring the discount to be presented from a recent, regularly offered, original price.

20.    Additionally, Adidas is not offering a discount or a percentage off (% off) a competitor's price for goods offered for sale in the relevant market. In the case of its "made for outlet" products, there are no other retailers who sell those goods; they are exclusively sold by Adidas outlets.  In the case of its out of season merchandise, the Adidas merchandise being offered at its outlet stores is not offered at any other relevant market competitors in the 90-day time period preceding the sale because it is old and outdated.

21.    How the scheme works: On all merchandise sold in the Adidas outlet stores, it represents to consumers a "***regular price***" on the product's price tag, along with a further discounted "***our price***."  Adidas then publishes the proffered discount as a percentage off (i.e., 40% off) of the "***our price***." For example:



---

[14] If Adidas continued to offer a discount from an original price beyond the 90 day time period afforded it under California law, it was required to disclose the date on which the original prices were last offered. Adidas does not make any such disclosure.

22.     The represented discounts are advertised on placards placed at, on, or above the particular products being discounted. They are printed on red card stock with white print offering the advertised "_% off". The placards appear as follows:



23.     The "***regular price***" and the discounted "***our price***" reference prices thus represent to consumers the merchandise's original price, while the "sale" price denotes to consumers a significantly discounted price, or savings from the regular higher price.

24.     Adidas outlets do not offer any outlet merchandise at the full, or original price—ever. Every product in the store is discounted from an original price, the minute it hits the floor.

25.     Defendant's perpetual discounting of the Adidas outlet merchandise constitutes false, fraudulent, and deceptive advertising because the original reference price listed is substantially higher than those prices ever actually offered by Defendant in its outlet stores. The reference prices are used exclusively as a benchmark from which the false discount and corresponding "sale" price is derived. Defendant's scheme has the effect of

tricking consumers into believing they are getting a significant deal by purchasing merchandise at a steep discount, when, in reality, consumers are paying for merchandise at its usual retail price. Defendant's deceptive pricing scheme further artificially raises the prices actually paid by consumers by creating the false impression of a bargain.

26.    Defendant's outlet-only-merchandise is *never* offered for sale, nor actually sold, at its advertised "***regular price***" or "***our price***." Similarly, regular Adidas merchandise, that may have been previously offered for sale at other retailers or online, is never offered for sale at Adidas outlet stores at its advertised "regular price" or "our price" within 90 days of that price being offered in the market. Upon information and belief, "out of season" Adidas merchandise is a small percentage of its outlet stores' total inventory and is typically several years removed from being marketed at the original price, if ever.

27.    Nowhere in Defendant's outlet stores does Defendant disclose that the reference or original prices used are not: 1) former prices; or 2) are not recent (within 90 days), regularly offered former prices; 3) or prices at which identical products are sold elsewhere in the market.  Nor does Adidas disclose the date at which the original prices were offered in the market or by one of Adidas' other retailers.  The omission of these disclosures, coupled with Defendant's use of fictitious advertised reference prices, renders Defendant's outlet pricing inherently misleading.

28.    Thus, the advertised reference prices are false and induce consumers into believing that the merchandise was once sold at the reference price, and will be again if the consumer does not make a purchase at the "bargain" price.  Defendant engages in this practice knowing full-well that the advertised products are never actually offered or sold at the advertised reference prices, or never actually offered or sold at the advertised reference prices within 90 days of them being discounted in the Adidas outlet store.

29.    Moreover, the advertised discounts were fictitious because the reference prices did not represent a *bona fide* price at which Defendant previously sold or offered to sell the products, on a regular basis, for a commercially reasonable period of time, as required by the Federal Trade Commission ("FTC").  In addition, the represented advertised reference

prices were not the prevailing market retail prices within the three months (90 days) immediately preceding the publication of the advertised former reference price, as required by California law.

30.     Thus, Defendant's scheme intends to, and does, provide misinformation to the customer. This misinformation communicates to consumers, including Plaintiff, that the products sold in Defendant's outlets have a greater value than the advertised discounted price.

**D.     Investigation**

31.     An investigation of Adidas outlet stores conducted by Plaintiff's counsel ("Plaintiff's Investigation") revealed that Defendant's outlet store merchandise is priced uniformly. That is, Adidas outlet merchandise sold at Adidas outlet stores bears a price tag with a false "*regular*" reference price, along with a substantially discounted "our price" from which an additional percentage off (% off) is taken, resulting in a seemingly much lower "sale price." Plaintiff's Investigation confirmed that the merchandise purchased by Plaintiff was priced with a false reference price and a corresponding discounted price for at least the 90-day period immediately preceding Plaintiff's purchase in violation of California law and the FTCA.

32.     Plaintiff's counsel's investigators cataloged the pricing practices of Adidas outlet stores across California, including in San Francisco (San Francisco Premium Outlets), Los Angles (Citadel Outlets) and San Diego (Las Americas Premium Outlets), from February of 2019, through June of 2019. Plaintiff's Investigation revealed that items listed for sale in Defendant's outlets were never offered for sale at either their full "*regular price*" *or* "*our price*" reference prices. Plaintiff's counsel's investigators visited Adidas outlet stores consistently throughout the investigation period to verify the prices being offered on Defendant's outlet merchandise. The prices were uniform across all stores visited in California. All items, including the product purchased by Plaintiff, in the Adidas outlet stores were priced at a discount in the 90 days prior to Plaintiff's purchase of his men's light grey sweatpants. A sample of the products tracked, which remained continuously

discounted throughout the observed period, include Mens DK Grey three strip shorts; Response Crew DX 1990; 3 Stripes Tee shirt Purple; and 3 Str Tights (CE 2441). *See* Exhibit A.

33.    Additionally, Plaintiff's Investigation attempted to locate the items sold at the Adidas outlet stores in other distribution channels in the relevant market. For example, in San Diego, Plaintiff's Investigation verified that the merchandise sold at Adidas outlet stores, was *not* the same as Adidas merchandise presented for sale at commonly known retailers such as Nordstrom Rack, Macy's, Ross Dress for Less, TJ Max, or Kohl's. Plaintiff's Investigation compared the items tracked in the Adidas outlet stores to Adidas merchandise offered for sale at the aforementioned retailers on a monthly basis during the course of the investigation.

34.    Thus, the "*regular price*" and the discounted "*our price*" on the Adidas merchandise sold at the Adidas outlet stores, including the "*regular price*" and the discounted "*our price*" listed on the sweatpants Plaintiff purchased, are either false original prices or severely outdated prices that have not been offered in the relevant market or at an Adidas store for at least more than a year.

35.    The false reference prices and corresponding discount price scheme were both uniform and identical on almost all of the merchandise sold at Defendant's outlet stores. The only thing that changed was the requisite "_% off" on certain merchandise items.

36.    The fraudulent pricing scheme applies to all Adidas outlet merchandise offered on sale at Defendant's California outlet stores, including the light grey sweatpants purchased by Plaintiff, as described below.

### IV.    PARTIES

**Plaintiff**

37.    Plaintiff resides in San Diego County, California.  Plaintiff, in reliance on Defendant's false and deceptive advertising, marketing and discounting pricing schemes, purchased a pair of men's light grey Adidas sweatpants from Defendant's outlet store located at the Las Americas Premium Outlets, 4201 Camino De La Plaza, San Diego, CA

92173, on May 20, 2019.  Plaintiff examined several men's apparel products at Defendant's San Diego outlet store before deciding on a final pair of light grey sweatpants after reviewing the items' advertised sale prices. The sweatpants Plaintiff purchased were advertised with a "*regular price*" of $55.00. Defendant advertised the item as having a discounted "*our price*" of $29.97, and the item was also advertised as an "***additional 50% off***." During his time at Defendant's outlet store on May 20, 2019, Plaintiff noticed numerous signs within the store advertising a "__% off" over items throughout the store. Plaintiff noticed that most, if not all, items in the store were accompanied by an in-store sign purporting to represent a "__% off."

38.    After observing the "*regular price*" and "*our price*" of the item and the accompanying sale price, Plaintiff believed he was receiving a significant discount on the items he had chosen.  Because he liked the item and felt that the discounted price would likely not last, and that he was getting a significant bargain on the merchandise, he proceeded to the register and purchased the pair of men's light grey sweatpants.  The "*regular price*" and corresponding "*our price*" of the item, along with the additional 50% off, led Plaintiff to believe that he was purchasing authentic Adidas merchandise that was previously available at Adidas retail stores or other retail stores at the advertised reference prices, or sold formerly for that price at Defendant's outlet store. He paid a total of $16.14 with tax.

39.    However, the merchandise Plaintiff purchased was never offered for sale at the reference price listed on the price tag, and certainly not within the 90 days preceding Plaintiff's purchase.  Neither Plaintiff's receipt nor any in-store signage observed or relied upon by Plaintiff indicated to him that the pair of sweatpants he purchased was not offered previously at the advertised reference price at the Adidas outlet store or elsewhere.

40.    At the time of his purchase, Plaintiff was also unaware that the products sold in Defendant's outlet store were manufactured for sale specifically and exclusively at Defendant's outlet stores and that the products are never sold anywhere else.  Neither Plaintiff's receipt, nor in-store signage, nor information listed on the price tags suggested

that the products were exclusive. Plaintiff was damaged in his purchase because Defendant's false reference price discounting scheme inflated the true market value of the sweatpants he purchased. Despite being misled by Defendant with respect to the product he purchased, Plaintiff lacks personal knowledge as to Defendant's specific pricing practices relating to all its California outlet merchandise. Consequently, Plaintiff is susceptible to reoccurring harm because he cannot be certain that Defendant has corrected its deceptive pricing scheme, and he desires to continue to purchase Adidas outlet merchandise from Adidas California outlet stores, assuming that he could determine whether he was receiving authentic Adidas products at a true bargain. However, he currently cannot trust that Defendant will label and/or advertise the merchandise truthfully and in a non-misleading fashion in compliance with applicable law. Plaintiff simply does not have the resources to ensure that Defendant is complying with California and federal law with respect to its pricing, labeling, and advertising of its California outlet merchandise. An injunction is the only form of relief which will guarantee Plaintiff and other consumers the appropriate assurances.

41.     Additionally, because of the wide selection of merchandise available and Defendant's California outlet stores, the fact that there are numerous items of outlet merchandise involved in Defendant's deceit, and due to the likelihood that Defendant may yet develop and market additional outlet merchandise items for sale at its California outlet stores, Plaintiff may again, though by mistake, purchase a falsely discounted product from Defendant under the impression that the advertised reference price represents a *bona fide* former price at which the item was previously offered for sale by Defendant.  Indeed, Plaintiff regularly shops at outlet stores, including Defendant's, and he desires to continue purchasing merchandise from Adidas outlet stores in the future. Moreover, Class (as defined below) members will continue to purchase the Adidas California outlet merchandise, reasonably, but incorrectly, believing that its advertised reference prices represent *bona fide* former prices at which the merchandise was previously offered for sale by Defendant.

42. Accordingly, Plaintiff, Class members and the general public lack an adequate remedy at law. Absent an equitable injunction enjoining Defendant from continuing in the unlawful course of conduct alleged herein, Plaintiff, Class members and the public will be irreparably harmed and denied an effective and complete remedy because they face a real and tangible threat of future harm emanating from Defendant's ongoing conduct, which cannot be remedied with monetary damages.

43. Moreover, Plaintiff lacks an adequate remedy at law with respect to his claim for equitable restitution because he has not yet retained an expert to determine whether an award of damages can or will adequately remedy his monetary losses caused by Defendant. Particularly, as legal damages focus on remedying the loss to the plaintiff, and equitable restitution focuses wholly distinctly on restoring monies wrongly acquired by the defendant, legal damages are inadequate to remedy Plaintiff's loss because Plaintiff does not know at this juncture, and is certainly not required to set forth evidence, whether a model for legal damages (as opposed to equitable restitution) will be viable or will adequately compensate Plaintiff's losses.

44. Finally, Plaintiff's case is substantially predicated on Defendant's violations of CAL. BUS. & PROF. CODE § 17501, an equitable claim, as Plaintiff's Investigation revolved around ensuring that Defendant did not sell outlet merchandise within the 90 days preceding Plaintiff's purchase and, likewise, that Defendant failed to disclose to consumers the date on which outlet merchandise was last offered at its advertised reference price. This claim and test of liability go to the heart of Plaintiff's case and the same test is not available under a CLRA legal claim for damages. Thus, Plaintiff does *not* have an adequate remedy at law because the CLRA does not provide the same metric of liability as CAL. BUS. & PROF. CODE § 17501, which is integral not only to Plaintiff's prayer for restitution, but also to Plaintiff's very theory of liability at trial. Accordingly, Plaintiff may set forth alternate claims for legal damages and equitable restitution.

**Defendant**

45.     Plaintiff is informed and believes, and upon such information and belief alleges, Defendant is an Oregon corporation with its principal executive offices at 5505 N Greenley Ave., Portland, OR 97217. Defendant is the American branch subsidiary of Adidas AG, a multinational apparel company founded and headquartered in Herzogenaurach, Germany, that designs and manufactures Adidas branded shoes, clothing, sporting goods, apparel and accessories.  Plaintiff is informed that Defendant, is responsible for Adidas' US operations, including operating Adidas outlet stores in California. Plaintiff is informed and believes that Defendant markets products in California and throughout the United States through retail and online channels, and also manufactures and sells cheaper "made-for-outlet" versions of such products exclusively in its outlet stores.  Plaintiff is informed and believes, and thereon alleges, that Adidas operates at least fifteen outlet locations in California.[15]

46.     Plaintiff does not know the true names or capacities of the persons or entities sued herein as Does 1-50, inclusive, and therefore sues such defendants by such fictitious names.  Plaintiff is informed and believes, and upon such information and belief alleges, that each of the Doe defendants is in some manner legally responsible for the damages suffered by Plaintiff and the Class members as alleged herein.  Plaintiff will amend his Complaint to set forth the true names and capacities of these defendants when they have been ascertained, along with appropriate charging allegations, as may be necessary.

47.     The reference prices listed and advertised on products sold at Defendant's outlet stores are false or severely outdated reference prices, utilized only to perpetuate Defendant's false discount scheme.

48.     Defendant knows that its reference price advertising is false, deceptive, misleading, and unlawful under California and federal law.

---

[15] *See* https://mallseeker.com/adidas-outlets.aspx?state=5.

49.     Defendant fraudulently concealed from, and intentionally failed to disclose to, Plaintiff and other members of the Class the truth about its advertised discount prices and former reference prices.

50.     At all relevant times, Defendant has been under a duty to Plaintiff and the Class to disclose the truth about its false discounts.

51.     Plaintiff reasonably relied upon Defendant's artificially inflated reference prices and false discounts when purchasing the men's light grey sweatpants from Defendant's outlet store in San Diego, California. Plaintiff would not have made such purchase but for Defendant's representations regarding the substantial discounts being offered on the merchandise. Plaintiff would like to continue shopping at Defendant's outlet stores in the future but cannot be certain of the veracity of Defendant's advertised bargains.

52.     Plaintiff and the Class reasonably and justifiably acted and relied on the substantial price differences that Defendant advertised, and made purchases believing that they were receiving a substantial discount on an item of greater value than it actually was. Plaintiff, like other Class members, was lured in, relied on, and was damaged by the deceptive pricing scheme that Defendant carried out.

## V.     CLASS ALLEGATIONS

53.     Plaintiff brings this action on behalf of himself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class against Defendant for violations of California state laws:

> All persons, within the State of California, who, within the preceding four years (the "Class Period"), purchased from a California Adidas outlet store one or more products at a purported discount from an advertised "reference" price and who have not received a refund or credit for their purchase(s).

Excluded from the Class is Defendant, as well as its officers, employees, agents or affiliates, parent companies and/or subsidiaries, and each of their respective officers, employees, agents or affiliates, and any judge who presides over this action.  Plaintiff reserves the right to expand, limit, modify, or amend this Class definition, including the addition of one or

more subclasses, in connection with his motion for Class certification, or at any other time, based upon, *inter alia*, changing circumstances and/or new facts obtained during discovery.

54. ***Numerosity***: The Class members are so numerous that joinder of all members is impracticable. Plaintiff is informed and believes that the proposed Class contains hundreds of thousands of individuals who have been damaged by Defendant's conduct as alleged herein.  The precise number of Class members is unknown to Plaintiff.

55. ***Existence and Predominance of Common Questions of Law and Fact***:  This action involves common questions of law and fact, which predominate over any questions affecting individual Class members.  These common legal and factual questions include, but are not limited to, the following:

a. whether, during the Class Period, Defendant used falsely advertised reference prices on its outlet products' labels and falsely advertised price discounts on merchandise sold in its outlet stores;

b. whether, during the Class Period, the reference prices advertised by Defendant were the prevailing market prices for the products in question during the three months period preceding the dissemination and/or publication of the advertised former prices;

c. whether Defendant's alleged conduct constitutes violations of the laws asserted;

d. whether Defendant engaged in unfair, unlawful and/or fraudulent business practices under the laws asserted;

e. whether Defendant engaged in false or misleading advertising;

f. whether Plaintiff and Class members are entitled to damages and/or restitution and the proper measure of that loss; and

g. whether an injunction is necessary to prevent Defendant from continuing to use false, misleading or illegal price comparison.

56. ***Typicality***: Plaintiff's claims are typical of the claims of the Class members because, *inter alia*, all Class members have been deceived (or were likely to be deceived)

by Defendant's false and deceptive price advertising scheme, as alleged herein. Plaintiff is advancing the same claims and legal theories on behalf of himself and all Class members.

57. ***Adequacy***: Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no antagonistic or adverse interest to those of the Class.

58. ***Superiority***: The nature of this action and the nature of laws available to Plaintiff and the Class make the use of the class action format a particularly efficient and appropriate procedure to afford relief to him and the Class for the wrongs alleged. The damages or other financial detriment suffered by individual Class members is relatively modest compared to the burden and expense that would be entailed by individual litigation of their claims against Defendant. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Absent the class action, Class members and the general public would not likely recover, or would not likely have the chance to recover, damages or restitution, and Defendant will be permitted to retain the proceeds of its fraudulent and deceptive misdeeds.

59. All Class members, including Plaintiff, were exposed to one or more of Defendant's misrepresentations or omissions of material fact claiming that former reference prices advertised prices were legitimate. Due to the scope and extent of Defendant's consistent false sale prices and advertising scheme, disseminated in a years-long campaign to California consumers, it can be reasonably inferred that such misrepresentations or omissions of material fact were uniformly made to all members of the Class. In addition, it can be reasonably presumed that all Class members, including Plaintiff, affirmatively acted in response to the representations contained in Defendant's false advertising scheme when purchasing merchandise sold at Defendant's outlet stores.

60. Plaintiff is informed that Defendant keeps extensive computerized records of its Adidas outlet customers through, *inter alia*, customer loyalty programs and general marketing programs. Defendant has one or more databases through which a significant

majority of Class members may be identified and ascertained, and it maintains contact information, including email and home addresses, through which notice of this action could be disseminated in accordance with due process requirements.

## VI.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**Violation of California's Unfair Competition Law ("UCL")**
**CAL. BUS. & PROF. CODE §§ 17200, *et seq.***

61.    Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

62.    The UCL defines "unfair business competition" to include any "unlawful, unfair or fraudulent" act or practice, as well as any "unfair, deceptive, untrue or misleading" advertising.  CAL. BUS. PROF. CODE § 17200.

63.    The UCL imposes strict liability.  Plaintiff need not prove that Defendant intentionally or negligently engaged in unlawful, unfair, or fraudulent business practices—but only that such practices occurred.

***"Unfair" Prong***

64.    A business act or practice is "unfair" under the UCL if it offends an established public policy or is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers, and that unfairness is determined by weighing the reasons, justifications and motives of the practice against the gravity of the harm to the alleged victims.

65.    Defendant's actions constitute "unfair" business practices because, as alleged above, Defendant engaged in misleading and deceptive price comparison advertising that represented false reference prices and corresponding deeply discounted phantom "sale" prices. Defendant's acts and practices offended an established public policy of transparency in pricing, and engaged in immoral, unethical, oppressive, and unscrupulous activities that are substantially injurious to consumers.

66.     The harm to Plaintiff and Class members outweighs the utility of Defendant's practices. There were reasonably available alternatives to further Defendant's legitimate business interests other than the misleading and deceptive conduct described herein.

### *"Fraudulent" Prong*

67.     A business act or practice is "fraudulent" under the UCL if it is likely to deceive members of the consuming public.

68.     Defendant's acts and practices alleged above constitute fraudulent business acts or practices, as they deceived Plaintiff and are highly likely to deceive members of the consuming public. Plaintiff relied on Defendant's fraudulent and deceptive representations regarding its false reference prices and corresponding phantom discounts on products sold at Defendant's outlets. These misrepresentations played a substantial role in Plaintiff's decision to purchase those products at purportedly steep discounts, and Plaintiff would not have purchased those products without Defendant's misrepresentations.

### *"Unlawful" Prong*

69.     A business act or practice is "unlawful" under the UCL if it violates any other law or regulation.

70.     Defendant's acts and practices alleged above constitute unlawful business acts or practices, as it has violated state and federal law in connection with its deceptive pricing scheme.  FTCA prohibits "unfair or deceptive acts or practices in or affecting commerce" (15 U.S.C. § 45(a)(1)) and prohibits the dissemination of any false advertisements. 15 U.S.C. § 52(a). Under the FTC, false former pricing schemes, similar to the ones implemented by Defendant, are described as deceptive practices that would violate the FTCA:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article.  If the former priced is the actual, bona fide price at which the article was offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison.  Where the former price is genuine, the bargain being advertised is a true one.  If, on the other hand, the former price being advertised is not bona fide but fictitious – *__for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction – the "bargain" being advertised is a false one__*; the purchaser is not receiving the unusual value he

expects. In such a case, the "reduced" price is, in reality, probably just the seller's regular price.

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of her business, honestly and in good faith – and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

16 C.F.R. § 233.1(a) and (b) (emphasis added).

71.     In addition to federal law, California law also expressly prohibits false former pricing schemes. California's FAL, BUS. & PROF. CODE § 17501, entitled "*Worth or value; statements as to former price*," states:

For the purpose of this article the worth or value of any thing advertised is the prevailing market price, wholesale if the offer is at wholesale, retail if the offer is at retail, at the time of publication of such advertisement in the locality wherein the advertisement is published.

No price shall be advertised as a former price of any advertised thing, unless the alleged former price was the prevailing market price as above defined within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly and conspicuously stated in the advertisement.

CAL. BUS. & PROF. CODE § 17501 (emphasis added).

72.     As detailed in Plaintiff's Third Cause of Action below, the CLRA, CAL. CIV. CODE § 1770(a)(9), prohibits a business from "[a]dvertising goods or services with intent not to sell them as advertised," and subsection (a)(13) prohibits a business from "[m]aking false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions."

73.     The violation of any law constitutes an "unlawful" business practice under the UCL.

74.     As detailed herein, the acts and practices alleged were intended to or did result in violations of the FTCA, the FAL, and the CLRA.

75.     Defendant's practices, as set forth above, have misled Plaintiff, the proposed Class, and the public in the past, and will continue to mislead in the future. Consequently,

Defendant's practices constitute an unlawful, fraudulent, and unfair business practice within the meaning of the UCL.

76.   Defendant's violation of the UCL, through its unlawful, unfair, and fraudulent business practices, are ongoing and present a continuing threat that Class members and the public will be deceived into purchasing products based on price comparisons of arbitrary and inflated "reference" prices and substantially discounted "sale" prices. These false comparisons created phantom markdowns and lead to financial damage for consumers like Plaintiff and the Class.

77.   Pursuant to the UCL, Plaintiff is entitled to preliminary and permanent injunctive relief and an order for Defendant to cease this unfair competition, as well as disgorgement and restitution to Plaintiff and the Class of all Defendant's revenues associated with its unfair competition, or such portion of those revenues as the Court may find equitable.

## SECOND CAUSE OF ACTION

### Violation of California's False Advertising Law ("FAL")
### CAL. BUS. & PROF. CODE §§ 17500, *et seq.*

78.   Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

79.   CAL. BUS. & PROF. CODE § 17500 provides:

It is unlawful for any…corporation…with intent…to dispose of…personal property…to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated…from this state before the public in any state, in any newspaper or other publication, or any advertising device, or by public outcry or proclamation, or in any other manner or means whatever, including over the Internet, any statement…which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading…

(Emphasis added).

80.   The "intent" required by section 17500 is the intent to dispose of property, and not the intent to mislead the public in the disposition of such property.

81.   Similarly, this section provides:

> No price shall be advertised as a former price of any advertised thing, unless the alleged former prices was the prevailing market price…within three months next immediately preceding the publication of the advertisement or unless the date when the alleged former price did prevail is clearly, exactly, and conspicuously stated in the advertisement.

CAL BUS. & PROF. CODE § 17501.

82.     Defendant's routine of advertising discounted prices from false "reference" prices, which were never the prevailing market prices of those products and were materially greater than the true prevailing prices (i.e., Defendant's actual sale price), was an unfair, untrue, and misleading practice.  This deceptive marketing practice gave consumers the false impression that the products were regularly sold on the market for a substantially higher price than they actually were, therefore, leading to the false impression that the products sold at Defendant's outlet stores were worth more than they actually were.

83.     Defendant misled consumers by making untrue and misleading statements and failing to disclose what is required by the Code, as alleged above.

84.     As a direct and proximate result of Defendant's misleading and false advertisements, Plaintiff and Class members have suffered injury in fact and have lost money. As such, Plaintiff requests that this Court order Defendant to restore this money to Plaintiff and all Class members, and to enjoin Defendant from continuing these unfair practices in violation of the UCL in the future.  Otherwise, Plaintiff, Class members, and the broader general public will be irreparably harmed and/or denied an effective and complete remedy.

## THIRD CAUSE OF ACTION

**Violation of California's Consumers Legal Remedies Act ("CLRA"),**
**CAL. CIV. CODE § 1750, *et seq.***

85.     Plaintiff repeats and re-alleges the allegations contained in every preceding paragraph as if fully set forth herein.

86.     This cause of action is brought pursuant to the CLRA, CAL. CIV. CODE § 1750, *et seq*. Plaintiff and each member of the proposed Class are "consumers" as defined by CAL. CIV. CODE § 1761(d). Defendant's sale of merchandise in its outlets to Plaintiff and the Class

were "transactions" within the meaning of CAL. CIV. CODE § 1761(e). The products purchased by Plaintiff and the Class are "goods" within the meaning of CAL. CIV. CODE § 1761(a).

87.    Defendant violated and continues to violate the CLRA by engaging in the following practices proscribed by CAL. CIV. CODE § 1770(a) in transactions with Plaintiff and the Class, which were intended to result in, and did result in, the sale of merchandise sold in its California outlet stores:

(13) Making false or misleading statements of fact concerning reasons for, existence of, or amounts of price reductions.

88.    Pursuant to § 1782(a) of the CLRA, on or about September 28, 2021, Plaintiff's counsel notified Defendant in writing by certified mail of the particular violations of § 1770 of the CLRA, and demanded that it rectify the problems associated with the actions detailed above and give notice to all affected consumers of Defendant's intent to act.

89.    If Defendant fails to respond to Plaintiff's letter, fails to agree to rectify the problems associated with the actions detailed above, or fails to give notice to all affected consumers within 30 days of the date of written notice, as prescribed by section 1782, Plaintiff will move to amend his Complaint to pursue claims for actual, punitive, and statutory damages, as appropriate against Defendant.  As to this cause of action, at this time, Plaintiff seeks only injunctive relief.

## VII.    PRAYER FOR RELIEF

Wherefore, Plaintiff, on behalf of himself and on behalf of the other members of the Class, requests that this Court award relief against Defendant as follows:

a.    an order certifying the Class and designating Plaintiff as the Class Representative and his counsel as Class Counsel;

b.    awarding restitution and disgorgement of all profits and unjust enrichment that Defendant obtained from Plaintiff and the Class members as a result of its unlawful, unfair, and fraudulent business practices described herein;

1         c.    awarding declaratory and injunctive relief as permitted by law or equity,

2 including: enjoining Defendant from continuing the unlawful practices as set forth

3 herein, and directing Defendant to identify, with Court supervision, victims of its

4 misconduct and pay them all money they are required to pay;

5         d.    order Defendant to engage in a corrective advertising campaign;

6         e.    awarding attorneys' fees and costs; and

7         f.    for such other and further relief as the Court may deem necessary or

8 appropriate.

9            **VIII.   DEMAND FOR JURY TRIAL**

10 Plaintiff hereby demands a jury trial for all of the claims so triable.

11 Dated: September 28, 2021                **CARLSON LYNCH LLP**

12                          By:  */s/ Todd D. Carpenter*

13                            Todd D. Carpenter (CA 234464)
tcarpenter@carlsonlynch.com
Scott G. Braden (CA 305051)

14                            sbraden@carlsonlynch.com

15                            1350 Columbia Street, Ste. 603
San Diego, California 92101

16                            Telephone:  (619) 762-1910
Facsimile:  (619) 756-6991

17                            *Attorneys for Plaintiff and*

18                            *Proposed Class Counsel*

19

20

21

22

23

24

25

26

27

28